Susan Simmons Qualls was indicted for the unlawful distribution of controlled substances, in violation of §13A-12-211, Code of Alabama 1975 (Supp. 1988). The appellant was found "guilty as charged in the indictment." She was sentenced to seven years' imprisonment in the penitentiary and fined $1000. The appellant was also ordered to pay $25 to the Victim's Compensation Fund.
Claude Cosey testified that he met the appellant while he was working as an undercover narcotics agent with the Alabama Alcoholic Beverage Control Board in March of 1988. He stated that he saw the appellant every weekend until May 21, 1988. At 9:45 p.m. that evening, the appellant approached Cosey as he was sitting in his car in the parking lot of the Tom Thumb convenience store in Florala, Alabama. The appellant asked Cosey if he wanted some marijuana because she knew where she could get some "killer pot." (R. 60). Cosey said he would take a bag, and the appellant told him the price was $30 a bag. Cosey gave her $30, and the appellant left the parking lot in her black Oldsmobile Cutlass automobile, tag number 23BM 170. When Cosey and the appellant first met, the appellant told him that she had just bought the car from a used car dealer in Opp.
The appellant returned to the Tom Thumb store about fifteen minutes later. Cosey got out of his car and went over to the appellant's car. She wanted him to get in her car, but he told her he had to go some place. The appellant then reached in her left shirt pocket and gave him a bag of plant material. Cosey got back in his car and left. The plant material was determined to be marijuana and the weight of the marijuana was 4.3 grams.
Hubert Ramer, the general manager of Jones Ford in Opp, Alabama, testified that the appellant had purchased a 1984 black Oldsmobile Cutlass Supreme, serial number 1G3AR47A4BM430405 on March 11, 1988. The tag number registered to that vehicle was 23BM 170.
The only witness who testified for the defense besides the appellant was Tammy O'Shields. O'Shields testified on direct examination that the appellant was at her house watching videotapes on the night in question. She testified that her boyfriend and his brother were also there that night.
The appellant testified that she was at O'Shields's house on the night of May 21, 1988. She remembered this particular night because her uncle's birthday was the day before. The appellant stated that she may have seen Cosey at the Tom Thumb store on an occasion but that she had never spoken to him. She stated that she had never sold marijuana.
 I
The appellant contends that the trial court erred by asking the jury the following voir dire questions which were requested by the State:
1) "Have you or has any member of your family ever been charged with violation of any drug law?"
2) "Are you personally acquainted with any person who has been charged with violation of any drug law?"
The rule in Alabama is clear that "each party has the right to have questions formulated by it propounded to the jury, either by the court or by the party as the court may determine, if such questions reasonably *Page 1160 
relate under the circumstances to the question of the qualification or interest or bias on the part of prospective jurors." Alabama Power Co. v. Bonner, 459 So.2d 827, 833 (Ala. 1984) (quoting Griffin v. State, 383 So.2d 873, 876
(Ala.Crim.App.), cert. denied, 383 So.2d 880 (Ala. 1980). See Cooper v.Bishop Freeman Co., 495 So.2d 559 (Ala. 1986) and Nodd v.State, 549 So.2d 139 (Ala.Crim.App. 1989) (overruling particular application of Bonner principle). This rule applies to the prosecution as well as the defense. Howell v. City ofBirmingham, 383 So.2d 567 (Ala.Crim.App.), cert. denied,383 So.2d 570 (Ala. 1980). The nature, the variety and the extent of voir dire questioning is within the sound discretion of the trial court, and we will not reverse the trial court's decision on this matter unless there has been an abuse of discretion.Dawkins v. State, 455 So.2d 220 (Ala.Crim.App.), cert.denied, (Ala. 1984).
We do not find that the trial judge abused his discretion by asking the questions requested by the State. These questions were designed to determine if any of the jurors, or their relatives or friends, had ever been charged with drug offenses. The information sought to be elicited by these questions would certainly be relevant to a prospective juror's interest or bias in a drug case, even though it probably would not be grounds for the disqualification of the juror. See Luttrell v. State,357 So.2d 1018 (Ala.Crim.App. 1978) (trial court did not err by asking, at the request of the State, whether any prospective jurors were prejudiced against undercover drug agents). Thus, we find no error here.
 II
The appellant argues that the State should have been required to disclose the identity of the informant who was in the car with Cosey on the night in question. "[I]f a confidential informer is a material witness, i.e., an active participant in the illegal transaction which leads to the charges brought against the accused, then the accused is entitled to learn from the State the identity of the confidential informant and his address." Self v. State, 420 So.2d 798, 800 (Ala. 1982) (citingRoviaro v. United States, 353 U.S. 53, 77 S.Ct. 623,1 L.Ed.2d 639 (1957)).
Cosey testified that an informant was in the car with him on the night of May 21, 1988. It is unclear from the record exactly what information this informant supplied with regard to this appellant. The informant obviously did not introduce Cosey to the appellant on the night in question because Cosey stated he had met the appellant in March of 1988 and he had seen her every weekend since that time. Furthermore, it does not appear that the informant set up the buy on this night because Cosey testified that his encounter with the appellant at the Tom Thumb store was a chance meeting. From the record, it is difficult to ascertain exactly how much of this drug transaction the informant actually witnessed. Cosey testified that he believes he got out of the car when the appellant initially asked him if he wanted any marijuana and the informant stayed in the car. In any event, he knows he got out of the car when the appellant returned with the marijuana. The informant stayed in the car on this occasion as well.
 "In cases . . . in which the informant has introduced the undercover law enforcement officer to the accused and then has only witnessed the drug sale between the officer and the accused, this Court has characterized the informant as a passive observer. In such cases, the disclosure of the informant's identity has not been required even where there has been a proper and timely request. Johnson v. State, 455 So.2d 997, 999
(Ala.Cr.App. 1984); Stanford v. State, 448 So.2d 472, 473 (Ala.Cr.App. 1984); Kilgore v. State, 50 Ala. App. 501, 503, 280 So.2d 206, 208 (1973)."
Lightfoot v. State, 531 So.2d 57, 59-60 (Ala.Crim.App. 1988).
The facts which are contained in the record clearly indicate that the informant in this case was merely a passive observer to the drug sale. Thus, the trial judge correctly refused to require the State to reveal this informant's identity. *Page 1161 
 III
During the prosecutor's closing arguments, the following occurred:
 "MRS. LOGGINS: Where are all these other people who should have been able to remember. . . .
 "MR. LANIER: Your Honor, now that is improper and we are going to ask for a mistrial at this point.
 "MRS. LOGGINS: No, Your Honor, it is not improper. . . .
"MR. LANIER: Yes, it is. . . .
 "MRS. LOGGINS: These witnesses are not equally available to us. . . .
 "MR. LANIER: Your Honor, again, we are going to object if it continues. . . .
"THE COURT: I overrule.
"MR. LANIER: We ask for a mistrial.
 "THE COURT: Well, I overrule your motion." (R. 172-73).
The appellant contends that the prosecutor's argument quoted above was improper.
 "It is settled law in this state that no unfavorable inference can be drawn and no unfavorable argument to a jury made by counsel against a party to a cause because of the failure to call a witness to testify when that witness is accessible to both parties. 'Available' and 'accessible' are words used interchangeably. Helton v. State, [433 So.2d 1186, Ala.Cr.App. 1983] supra; Brown v. State, 50 Ala. App. 471, 280 So.2d 177, cert. denied, 291 Ala. 774, 280 So.2d 182
(1973). Availability of a witness to one or the other of the parties is determined, first, by the party's superior means of knowing of the existence and identity of the witness and, second, by the relationship of the witness to the party that would reasonably be expected to affect the witness's personal interest in the outcome of the litigation, thus making it natural to expect or assume he would testify in favor of one party and against the other. Hunt v. State, 453 So.2d 1083 (Ala.Cr.App.), cert. denied, 453 So.2d 1083 (Ala. 1984); Miller v. State, 431 So.2d 586 (Ala.Cr.App. 1983); Brown v. State, supra."
Hornsby v. State, 517 So.2d 631, 636 (Ala.Crim.App.), cert.denied, 517 So.2d 639 (Ala. 1987).
 "Whether a witness is available or accessible within the meaning of the rule prohibiting comment upon the failure of a party to call or examine a witness does not mean availability or accessibility for subpoena purposes, but rather a particular party's superior knowledge of the existence, identity, and expected testimony of the witness. Henry [v. State, 355 So.2d 411, Ala.Cr.App. 1978], supra; Rueffert v. State, 46 Ala. App. 36, 237 So.2d 520."
McMorris v. State, 394 So.2d 392, 402 (Ala.Crim.App. 1980),cert. denied, 394 So.2d 404 (Ala. 1981).
In the case at bar, it is unclear what potential witnesses were the subject of the prosecutor's comment. All that we can ascertain from the record is that the prosecutor was referring to Tammy O'Shields's boyfriend and his brother, who were supposedly at O'Shields's house on the night the appellant watched videotapes there.
It appears from the record that O'Shields's boyfriend and his brother would not have been equally available to both parties because they were possible alibi witnesses.
 "In Alabama a defendant is not required to notify the state of an alibi defense. Therefore, in most cases, the state has no way of knowing which witnesses would or could testify as to the whereabouts of the accused at the time of the offense in establishing an alibi defense. Indeed, generally the state would not even know of the existence of the alibi defense until such testimony came from the witness stand. Therefore since the appellant was in a superior position to know of the existence and identity of his alibi witnesses it was not error for the state to comment upon his failure to produce other witnesses whose testimony would presumably aid the appellant or substantiate his story if the story were true."
Henry v. State, 355 So.2d 411, 413 (Ala.Crim.App. 1978). Seealso Hunt v. State, *Page 1162 453 So.2d 1083 (Ala.Crim.App.), cert. denied, (Ala. 1984).
The appellant cites us to numerous other comments made by the prosecutor which he argues were improper. We find it unnecessary to specifically address each of these comments. In each instance, we find that either the comments were proper (because they were arguable inferences from the evidence or an appeal for law enforcement), or we could not determine from the record the context in which the comment was made, or defense counsel failed to make a specific objection to the comment. We also note that the trial judge sustained defense counsel's objection to one of the prosecutor's comments and gave appropriate instructions to the jury. Therefore, we find no error here. See Turner v. State, 484 So.2d 1165
(Ala.Crim.App. 1985); Gorman v. State, 448 So.2d 495 (Ala.Crim.App. 1984).
 IV
During the State's cross-examination of Tammy O'Shields, the following occurred:
 "Q. Miss O'Shields, do you recall March 24th of 1989, at the Florala Police Department when you gave the statement on this tape. . . .
"A. Yes, ma'am. . . .
"Q . . . to Porter Harris?
"A. Yes, ma'am.
"Q. All right. . . .
 "MR. LANIER: Your Honor, we object. We are going to object to any conversation that she may have had with anyone. She is not the Defendant. She is a witness in the case and that's not the proper way to impeach a witness' testimony. If she has a transcript of that testimony and wants to show it to the witness, there is a proper procedure to impeach a witness. . . .
 "THE COURT: Well, at this point, she has asked her what she remembers of the conversation.
"MR. LANIER: Okay. I just. . . .
 "THE COURT: I'll require her to confront her with the conversation as a part of her predicate.
 "Q. Do you recall that Mr. Porter Harris swore you in and asked you to raise your right hand and swear under oath that what you were going to tell him was the truth?
"A. Yes, ma'am.
 "Q. All right. And do you remember telling him on that occasion that you knew that Susan was arrested but that's all that you knew?
"A. Yes, ma'am.
 "Q. Do you recall telling him that you couldn't remember February of 1988, or March or April or May?
"A. I told him that I didn't remember any dates."
 "Q. All right. And did you remember telling him that Susan Qualls came to you and said that she watched movies with you that night and that she did watch with us sometimes, she didn't stay all that long. It was a weekend, but you didn't remember when or what time or what date it was?
 "A. I don't remember when and what time, what day or nothing." (R. 128-30).
After defense counsel completed his redirect examination of this witness, the following occurred:
 "MR. LANIER: I guess the record will just have to speak for itself, Judge. Again, at this point, I would ask for a mistrial based on the cross-examination of the State. I don't feel like it was proper and the proper predicate was not laid to use the tactic that she used to cross-examine our witness.
"THE COURT: Okay. Overruled." (R. 133).
The appellant contends on appeal that the State failed to lay a proper predicate prior to questioning O'Shields concerning her prior inconsistent statement.
 "[A] witness cannot be impeached by proof of contradictory statements made by him, whether oral or in writing, without first asking him whether he made such declarations, specifying with reasonable certainty the time when, the place where, the person to whom such statement was made and the substance of such statement." *Page 1163 
Johnston v. State, 455 So.2d 152, 159 (Ala.Crim.App.), cert.denied, (Ala. 1984) (citations omitted). See also C. Gamble,McElroy's Alabama Evidence, § 157.01(1) (3rd ed. 1977); W. Schroeder, J. Hoffman R. Thigpen, Alabama Evidence, § 6-8(a) (1987).
In addition, if the prior inconsistent statement "was written by the witness or was signed by the witness or it was prior sworn testimony of the witness," the statement must be shown to the witness before he can be cross-examined concerning this prior statement. Parker v. State, 266 Ala. 63, 69, 94 So.2d 209
(1956). This rule of law evolved from the English decision inQueen Caroline's Case, 2 Bros. B. 284, 129 Eng.Rep. 976 (1820). In United States v. Dilliard, 101 F.2d 829, 837 (2d Cir. 1938), Judge Learned Hand stated that this rule is "everywhere more honored in the breach than in the observance." Nevertheless, this rule remains in effect in this jurisdiction as well as in the majority of jurisdictions of this country despite strong criticism of the rule. See 4 Wigmore, Evidence § 1260 (Chadbourne rev. 1972); McElroy's at § 158.01(1); 21 Am.Jur. P.O.F.2d Impeachment of Witness — PriorInconsistent Statement § 4, p. 108-11; Stern Grosh, A Visitwith Queen Caroline: Her Trial and its Rule, 6 Cap.U.L.Rev. 165 (1976). M. Graham, Prior Inconsistent Statements —Requirements for Impeachment, 21 Crim.L.Bull. 156 (1985).
Although the prosecutor did alert O'Shields to the circumstances surrounding the making of this statement, he did not show her a transcript of her sworn, taped statementbefore he questioned her about this statement. Thus, he did not lay a proper predicate in this instance.
The State argues in its brief that the prosecutor was not required to show O'Shields a transcript of her statement because it was made on a tape and, therefore, it was not a writing. This argument is without merit. If a recorded oral statement has been authenticated or acknowledged by the maker of the statement, a transcript of that statement must be shown to that witness prior to cross-examination of him concerning that statement. See Johnson v. State, 43 Ala. App. 224,187 So.2d 281 (1966) (if statement made by a witness at a former trial is to be used for impeachment, it must first be shown to the witness); Massey v. State, 49 Ala. App. 345, 272 So.2d 271,cert. denied, 289 Ala. 747, 272 So.2d 278 (1972) (transcript of preliminary hearing containing previously given sworn testimony of a witness must be shown to the witness prior to impeachment); Headley v. State, 55 Ala. App. 303, 314 So.2d 905,cert. denied, 294 Ala. 758, 314 So.2d 908 (1975) (proper predicate laid where witnesses were shown transcripts of their testimonies at a prior trial before impeachment in present trial); Walker v. State, 416 So.2d 1083 (Ala.Crim.App.),cert. denied, (Ala. 1982) (defense counsel should have shown witness transcript of her previously sworn testimony at habeas corpus proceeding prior to attempted impeachment). See alsoMcElroy's, at § 158.01(2).
O'Shields's taped statement to the police was made under oath and, thus, was properly authenticated by her. The prosecutor should have shown the statement to her prior to cross-examination of her about the statement. The prosecutor failed to lay a proper predicate and this was error.
However, we find that the error was harmless.
 "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Rule 45, A.R.A.P.
Under the particular facts of this case, we believe that the failure of the prosecutor to lay the proper predicate was error without injury because there is very little *Page 1164 
likelihood O'Shields's testimony would have been different had she been shown a transcript of her statement before she was questioned about it. O'Shields admitted making the prior statement as well as the substance of the prior statement. We believe she would have been just as, if not more, likely to have made this admission if she had seen the statement before she was questioned about it. Thus, the prosecutor's failure to show O'Shields a transcript of her prior inconsistent sworn taped statement before questioning her about this statement was harmless error in this instance.
 V
During the sentence hearing, Officer Jimmy Hildreth of the Florala Police Department testified that the Tom Thumb convenience store is located three-tenths of a mile from the Florala Elementary School. Thereafter, the appellant was sentenced under § 20-2-79, Code of Alabama 1975 (Supp. 1988), which states:
 "In addition to any penalties heretofore or hereafter provided by law for any person convicted of an unlawful sale of a controlled substance, there is hereby imposed a penalty of five years incarceration in a state corrections facility with no provision for probation if the situs of such unlawful sale was on the campus or within a one-mile radius of the campus boundaries of any public or private school, college, university or other educational institution in this state."
The appellant contends on appeal that she should not have been sentenced under § 20-2-79 because the sale took place when school was not in session. Although this issue has not been specifically addressed in this state, the federal courts have decided this issue with regard to the federal "schoolyard statute" which provides for enhanced penalties for those convicted of drug distribution within 1000 feet of a school.See 21 U.S.C.A. § 845(a) (West 1989). In United States v.Cunningham, 615 F. Supp. 519 (S.D.N.Y. 1985), the defendants argued that the "schoolyard statute" should not apply to them because their conduct involved "the sale of narcotics to an adult, two hours after school had finished for the day, in an apartment located on a different street than that which P.S. 113 is located on." Cunningham, 615 F. Supp. at 520. The court, in addressing this contention, stated:
 "The defendants' argument is flawed, however, in that their basic premise rests on an unduly and unjustifiably restrictive and narrow interpretation of both the plain language of Section 845a and Congressional purpose. It is clear from the plain language of Section 845a, and from its legislative history, that it was not designed to punish only sales of narcotics directly to schoolchildren within one thousand feet of a school. Rather, the statute is designed to protect schoolchildren from the direct and indirect dangers posed by the narcotics trade. The statute attempts to do this by creating, in effect, a circular area, with a radius of one thousand feet, around all elementary and secondary schools which will be free of any narcotics traffic, and all of the direct and indirect evils posed by this activity. It is difficult to envision any language more precise and unambiguous than that contained in Section 845a which Congress could have used to accomplish this purpose. Moreover, if Congress merely intended to punish the direct sale of narcotics to schoolchildren, or to prosecute only transactions occurring during school hours, or only transactions which occur on the same street which a school is located on, as the defendants contend, it could have used clear language to that effect in Section 845a."
Cunningham, 615 F. Supp. at 520.
In United States v. Jones, 779 F.2d 121 (2d Cir. 1985), cert.denied, 475 U.S. 1031, 106 S.Ct. 1236, 89 L.Ed.2d 344 (1986), the Second Circuit held that the "schoolyard statute" applied to the defendant even though the sale was made to an adult "at night inside a bar and numbers joint at least 2 1/2 blocks away from an elementary school." This was despite the fact that the sale did not take place at a "hangout" (i.e. a place frequented by children). See also State v. Ogar, 229 N.J. Super. 459,551 A.2d 1037 (1989) *Page 1165 
(New Jersey's "schoolyard statute" intended to create a permanent 24-hour safety zone around schools).
We also believe that the legislature, by enacting Alabama's "schoolyard statute," intended to create an around-the-clock drug-free atmosphere on or near school grounds. It is common knowledge that many official activities, including club meetings, sporting events, dances, etc., take place on school grounds after hours and that students often use a school's facilities (i.e., tennis courts, basketball courts, playgrounds) for their own recreation. Furthermore, areas near schools frequently become "hangouts" for students. These areas become places where students congregate and socialize at all hours of the day. Therefore, we believe that the legislature clearly intended to protect these areas, as well as school grounds, from the evils associated with drug activities at all times.
The appellant also argues that she should not have been sentenced under this statute because there was no proof that Officer Hildreth's odometer had been recently calibrated. This issue was not raised in the trial court and, thus, has not been preserved for our review. Bell v. State, 466 So.2d 167
(Ala.Crim.App. 1985).
The appellant fell within the provisions set out in §20-2-79, Code of Alabama 1975 (Supp. 1988), and was properly sentenced.
The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.